UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff(s),

v.

NATHANIEL ALLEN WHITE,

    Defendant(s).
    _____/

Case No. 09-20438

Honorable Nancy G. Edmunds

**OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS [12]**

    This matter comes before the Court on Defendant's motion to suppress evidence allegedly seized in violation of Defendant's Fourth Amendment rights. An evidentiary hearing was held on February 2, 2010. The Court fully credits the testimony of the law enforcement officers at the hearing and finds that the warrantless search did not violate Defendant's Fourth Amendment rights because: (1) the officers obtained valid and voluntary consent to search the house from Samantha White; and (2) the officers legally entered the house due to exigent circumstances. Accordingly, Defendant's motion to suppress is DENIED.

**I.    Facts**

    On August 16, 2009 at 10:09 a.m., a 911 call was placed by an individual—later identified as Jopez Johnson (Johnson)—that a man "standing in his drawers with dreadlocks" near the intersection of Constance and Ashton, in the City of Detroit, had just fired a gun at him. (2/2/10 hrg., Kue testimony; Pl.'s Resp., Ex. 1.) This information was

relayed through dispatch to the Detroit Police Department (DPD). DPD Officers James Wiencek and Stephen Kue, who were in the area, responded to the request for assistance and were the first officers to arrive at the scene, arriving only a few minutes after the call. (2/2/10 hrg., Kue testimony; Pl.'s Resp. at 1-2.) Some time after the arrival of Officers Wiencek and Kue, other DPD officers, including Chad Bristol and Cecilia Smith arrived. (2/2/10 hrg., Kue testimony, Smith testimony; Pl.'s Resp. at 2.)

When Officers Wiencek and Kue arrived at the scene, a woman—later identified as Samantha White (White), Defendant's wife—flagged the officers down. At that time, Johnson, having noticed that the police had arrived, walked over to the scene. White and Johnson recounted to the officers what had transpired.[1] (2/2/10 hrg., Kue testimony, Hahn testimony; Pl.'s Resp., Exs. 2-3.)

White told the officers that she and her husband, Nathaniel White (Defendant), were outside of their house, sitting in the car, when an argument broke out between them. Johnson walked by the car and stopped to see if White was ok. Defendant asked Johnson, "What the fuck you looking at?" Johnson responded, "What the fuck you looking at?" White, believing that Defendant and Johnson were going to fight, went into the house. Defendant then called Johnson a "punk ass bitch" and also went inside the house. Defendant came out of the house with a firearm, stood on the porch, and started shooting at Johnson. Johnson retreated to a nearby McDonalds and called 911. White, upon hearing shots,[2] ran out of the house, jumped into her vehicle, and drove around the corner—at which point the

---

[1] Later, at the police station, White and Johnson provided written statements. (Pl.'s Resp., Exs. 2-3.)

[2] White heard the shots, but did not see who fired them. (Pl.'s Resp., Ex. 2.)

2

police arrived. Defendant then retreated back inside the house. (2/2/10 hrg., Kue testimony, Hahn testimony; Pl.'s Resp., Exs. 2-3.)

Officers Wiencek, Kue, and Bristol proceeded to the house. When the officers arrived at the front porch, they knocked and announced their presence, but no one answered the door. (2/2/10 hrg., Kue testimony, Hahn testimony, Wiencek testimony)

The officers asked White for permission to go into her house to arrest Defendant and retrieve the firearm. White consented to the search and gave the Officer Kue her key to the house. (2/2/10 hrg., Kue testimony, Hahn testimony, Wiencek testimony; Pl.'s Resp., Ex. 2.) Later, Officer Smith had White read and sign a written consent to search form documenting the prior consent that she had provided. (2/2/10 hrg., Smith testimony, Hahn testimony, Wiencek testimony; Pl.'s Resp., Ex. 4.)

Then, using the key that White had given them, the officers unlocked the front door. The officers entered the house and looked through the first floor rooms for Defendant, but did not find him. The officers proceeded upstairs, to the second floor of this bungalow style house. They observed a person with dreadlocks—i.e., a person matching the description of the suspect and later identified as Defendant—on the ground upstairs. The officers secured and handcuffed Defendant. Inside a cabinet—next to Defendant—the officers observed and recovered a knotted plastic baggie containing smaller plastic baggies, which in turn contained suspected narcotics. The officers also recovered an AK-style firearm from a nearby open attic space, which matched the description of the gun that the officers had previously been given. (2/2/10 hrg., Kue testimony, Wiencek testimony; Pl.'s Resp. at 2-3.) A utility bill to that address in White's name was also observed and recovered. (Pl.'s Resp., Ex. 5.)

Defendant was arrested and charged by Indictment with Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g).

This matter comes before the Court on Defendant's motion to suppress evidence seized in violation of Defendant's Fourth Amendment rights.

## II.  Analysis

Defendant does not contest that the officers properly arrested him—that the officers had probable cause to effectuate his arrest. Instead, Defendant argues that the officers improperly entered the house and, thus, all evidence seized there should be suppressed as the fruit of an illegal entry and search. In support of his motion to suppress, Defendant argues that: (1) the officers entered the house without a search warrant or valid consent to search; and (2) the officers did not obtain voluntary consent to search the house. The government, on the other hand, contends that it obtained valid and voluntary consent from White, and this Court agrees.

### A.  Fourth Amendment Protection Against Unreasonable Searches and Seizures

The Fourth Amendment to the Constitution provides "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV.

In *Payton v. New York*, 445 U.S. 573, the Supreme Court held "that the Fourth Amendment … prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." *Id.* at 576. A warrantless search is "per se unreasonable under the Fourth Amendment—subject only to a few

specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). The exception at issue in this case is consent.[3]

The Court notes at the outset that "[i]t is the government's burden, by a preponderance of the evidence, to show through clear and positive testimony" that White's valid and voluntary consent to the search was obtained. *United States v. Worley*, 193 F.3d 380, 385 (6th Cir. 1999) (internal quotations and citations omitted).

**1. Valid Consent**

Consent may be obtained from the individual whose property is searched, or in certain instances, from a third party. *United States v. Matlock*, 415 U.S. 164, 169-72 (1974). Where, as here, the consenting party is not the defendant but a third party, the consent is valid if that party had actual authority or apparent authority over the premises. *United States v. Caldwell*, 518 F.3d 426, 429 (6th Cir. 2008). Actual authority exists where consent to a warrantless search is provided by a third party who possesses common authority over, or sufficient relationship to, the premises sought to be inspected. *Matlock*, 415 U.S. at 169-72. Common authority is not to be implied from a mere property interest, but rests on mutual use of the property by persons generally having joint access or control for most purposes, so that each has the right to permit inspection in his own right and so that the others have assumed the risks thereof. *Id*. at 172 n.7. Apparent authority exists where "the

---

[3] No warrant is required, however, "when the person to be arrested or some other person with a sufficient interest in the premises to admit visitors (e.g., the intended arrestee's spouse, parent, sibling, live-in girl friend or other occupant, or even a guest who is more than a casual visitor) voluntarily consented to entry by a known police officer." 3 WAYNE R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 6.1 (4th ed.). *See also Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) ("It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent.").

facts available to the officer at the moment ... [would] warrant a man of reasonable caution in the belief that the consenting party had authority over the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990) (quoting *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968) (internal quotations omitted)).

Although the officers did not have a warrant to search the house, valid consent was received from White prior to entry.[4] White gave the officers permission to enter the house, where, according to White, she and Defendant resided together as husband and wife. (2/2/10 hrg., Kue testimony, Hahn testimony, Wiencek testimony, Smith testimony; Pl.'s Resp., Ex. 2.) White provided the officers with her keys to facilitate their entry. (2/2/10 hrg., Kue testimony, Hahn testimony, Wiencek testimony; Pl.'s Resp., Ex. 2.) The officers also subsequently obtained written consent to search the premises from White. (2/2/10 hrg., Hahn testimony, Smith testimony; Pl.'s Resp., Ex. 4.) Additionally, White was receiving utility bills in her name at that address. (Pl.'s Resp., Ex. 5.) White, therefore, had actual authority to consent to the search.

Moreover, because White had keys to the front door and told the officers it was her house, she also had apparent authority to validly authorize the search. *See, e.g.*, *United States v. Hudson*, 405 F.3d 425, 441-42 (6th Cir. 2005) (holding that a third party had apparent authority to consent to a search of a home where the defendant lived because

---

[4] Defendant contends that White did not have authority to validly consent to the search because: (1) the officers confronted White at a location some distance from the house; (2) the officers never saw White enter or exit the house; (3) the officers did not see her name on any deed or lease;(4) the officers did not review any identification of White's which linked her to the house; and (5) the officers did not verify that the vehicle White was driving was registered to or linked to the house. As discussed, the Court finds Defendant's arguments unpersuasive.

"the officers reasonably believed that [the third party] and [the defendant] were romantically involved and had a child; [the third party and the defendant] and the child lived with [the defendant's grandmother] ...; and [the third party] had a key to the home"); *Harajli v. Huron Twp.,* 365 F.3d 501, 506 (6th Cir. 2004) (concluding that a third party had apparent authority to consent to the search of a house when she had lived there "in the recent past" and possessed a garage door opener, which she used to gain access to the house).

Consent, therefore, was validly obtained from a proper person.[5]

### 2. Voluntary Consent

Consent in all cases must also be voluntary. *See Schneckloth*, 412 U.S. at 220. "The question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Id.* at 227. To evaluate the totality of the circumstances, the Court should consider several factors such as "the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; and whether the individual understands his or her constitutional rights." *United States v. Ivy*, 165 F.3d 397, 402 (6th Cir. 1998). In addition, the Court "should consider the details of the detention, including the length and nature of detention; the use of coercive or punishing conduct by the police, and indications of 'more subtle forms of coercion that might flaw [an individual's]

---

[5] The government also notes that, assuming Defendant challenges White's authority, then he (as White's husband) would presumably lack standing to challenge the entry into the home where he was arrested. In other words, because the "Fourth Amendment protects people, not places," *Katz*, 389 U.S. at 351, a defendant claiming that his Fourth Amendment rights were violated has the burden of demonstrating that "he manifested a subjective expectation of privacy in the object of the challenged search; and ... [that] society is prepared to recognize that expectation as legitimate." *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1510 (6th Cir. 1988).

judgment.'" *Id.* (quoting *United States v. Watson*, 423 U.S. 411, 424 (1976)) (internal citation omitted). No single factor is dispositive of the analysis. *Schneckloth*, 412 U.S. at 226.

Upon consideration of the totality of the circumstances, this Court finds that the government has met its burden of showing that White's consent was also voluntary.[6] White was not threatened or subjected to repeated or prolonged questioning, but was briefly interviewed at the scene by the officers. *See, e.g.*, *United States v. Coleman*, 458 F.3d 453, 459 (6th Cir. 2006) (holding that consent was voluntary in part because the officers "did not threaten him in any way to induce his consent to their search"); *United States v. Abdullah*, 162 F.3d 897, 902 (6th Cir. 1998) (holding that consent was voluntary in part because "the atmosphere during the conversations with the defendant were congenial, that [defendant] spoke freely, intelligently, and at length with the officers about other subjects, and that the defendant seemed to understand the requests made of him"). White was not placed under arrest, handcuffed, or detained. *See, e.g.*, *Coleman*, 458 F.3d at 459 (holding that consent was voluntary in part because the defendant "had not yet been placed formally under arrest"). There was no use of physical threats, punishment, or other coercive techniques. *See, e.g.*, *United States v. Carter*, 378 F.3d 584, 588 (6th Cir. 2004) (holding that consent was voluntarily in part because the defendant "was not threatened, coerced, or tricked"). While the officers were armed and in uniform, no weapons were drawn. *See, e.g.*, *United*

---

[6] Defendant contends that White did not voluntarily consent to the search because: (1) shortly before the search, the officers first encountered White by pulling beside her vehicle; (2) the officers that approached White were uniformed and armed; and (3) the officers were yelling at White and took her key ring out of the ignition. As discussed, the Court finds Defendant's arguments unpersuasive.

*States v. Khanalizadeh*, 493 F.3d 479, 484 (5th Cir. 2007) (holding that consent was voluntarily in part because the "officer did not physically restrain the defendant, did not brandish weapons, and did not use deception") (internal citation omitted); *United States v. Bradley*, 163 Fed. App'x 353, 357 (6th Cir. 2005) (upholding district court's ruling that consent was voluntary in part because, while "[t]he officers were armed, to be sure, ... no weapons at any time were drawn") (internal citation omitted). During the interview, White was cooperative and provided the officers with the key to her house. *See, e.g.*, *United States v. Acosta*, 363 F.3d 1141, 1151 (11th Cir. 2004) (holding that consent was voluntary based in part on evidence that defendant provided a key the officer); *Carter*, 378 F.3d at 589 (noting that there are no "magic words" that need to be uttered to provide consent). White, later that same day confirmed, in a written statement, that she had in fact provided consent. *See, e.g.*, *United States v. McCauley*, 548 F.3d 440, 447 (6th Cir. 2008) (holding that consent was voluntarily in part because of the officers testimony that the defendant's wife was "cooperative" and, later that same day, a detective testified that the wife confirmed she gave consent). The totality of the circumstances establishes that White voluntarily consented to the officers' entry of the house.

Accordingly, this Court finds that White's consent was both valid and voluntary.[7]

---

[7] The government additionally contends—and this Court agrees—that, even if White had not provided consent, the officers validly entered the house because of exigent circumstances. *See Bing ex rel. Bing v. City of Whitehall, Ohio* 456 F.3d 555, 564 (6th Cir. 2006) ("[E]xigent circumstances exist when an immediate and serious threat to the safety of the police or the public is present."). Here, a dangerous exigency existed when the officers arrived at the scene of an attempted shooting within minutes of the 911 call reporting the same and determined that the shooter went inside a nearby house (i.e., Defendant was in a house where he could continue to shoot at the victim, the police, or other individuals in the neighborhood). *See id.* (holding that "a dangerous exigency existed" to enter a house to effectuate an arrest because the defendant "had shown a willingness

**B. Evidence Properly Seized**

Defendant does not argue that there was anything improper about his consequent arrest or the seizure, except insofar as the seizure of the firearm, ammunition and other items would be the "fruit of the poisonous tree" had the initial search been improper. Because the initial search was proper, the tree is untainted, and in the absence of any other reason to suppress the resulting evidence, it is properly admitted. As White's consent was valid and voluntary, the search was proper; thus, the firearm, ammunition, and other items were properly seized.

White's consent permitted the officers to search the house and seize "indicia of a crime," including "guns." (2/2/10 hrg., Smith testimony; Pl.'s Resp., Ex. 4.) Moreover, once law enforcement officers are lawfully inside a house to arrest a suspect, they can search places necessary to find the suspect and other individuals who may attack police, as well as places where the suspect may hide weapons. *See Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 299 (1967) ("The permissible scope of search must, therefore, at the least, be as broad as may reasonably be necessary to prevent the dangers that the suspect at large in the house may resist or escape."); *Maryland v. Buie*, 494 U.S. 325, 334 (1990)

---

to fire weapons in his neighborhood and could have harmed others in an instant with little effort"); *Hancock v. Dodson*, 958 F.2d 1367, 1375-76 (6th Cir. 1992) (holding that exigent circumstances exist where officers received call over police radio regarding a situation involving suicidal and possibly homicidal gunman, when officer arrived at back door of residence he saw owner standing on front porch but could not see whether owner was armed, and officer decided to go through house because it was quickest route to get to owner to determine extent of threat he posed); *United States v. Huffman*, 461 F.3d 777, 784 (6th Cir. 2006) (holding that exigent circumstances exist where "the police officers responded to a 911 call reporting gunshots" at the residence and the "officers ... conducted an additional investigation upon arriving at the scene", including discovery of bullet holes). Thus, even if White had not consented, the police properly entered the house.

(holding that police may, "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched"). Further, if during the course of this search, officers observe contraband in plain view, they may properly seize these objects. *See Huffman*, 461 F.3d at 785-86 (holding that officers, who were lawfully within the house to arrest the defendant and "during a walk-through of the residence" observed that "the assault rifle was lying on the table in plain view", could properly seize the firearm); *United States v. McLevain*, 310 F.3d 434, 440 (6th Cir. 2002) (noting that objects in "plain view" can be seized so long as "the criminality of the articles before the officers [are] immediately apparent") (internal quotations and citations omitted). Here, the objects were properly seized and should not be suppressed.

### III.   Conclusion

For the foregoing reasons, Defendant's motion to suppress is DENIED.


       s/Nancy G. Edmunds
       Nancy G. Edmunds
       United States District Judge

Dated: February 4, 2010

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on February 4, 2010, by electronic and/or ordinary mail.

       s/Carol A. Hemeyer
       Case Manager